**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| XIOMORA NICHOLS | : | |
| Plaintiff | : | CIVIL ACTION – LAW |
| | : | |
| v. | : | NO. |
| LAWRENCE H. WOODWARD | : | |
| FUNERAL HOME | : | |
| UPPER EAST SIDE | : | |
| REHABILITATION CENTER | : | |

## COMPLAINT

### JURISDICTION

This Court has original and exclusive jurisdiction over this action pursuant to 28 U.S.C. 1332 (c). The Southern District of New York of the United States for the District in which the cause of action arose and is pending, and thus, is the proper venue for this action.

### PARTIES

1. Plaintiff, Xiomara Nichols is an adult individual and the niece of the deceased, Jean Bryan who resides at 1409 Pedigree Street, Frederick, MD 21702.

2. Defendant Upper East Side Rehabilitation Center is a nursing and rehabilitation facility properly doing business in the City of New York and whose address is 211 East 79 Street, New York, NY 10075

3. Defendant Lawrence H. Woodward Funeral Home is a funeral home company properly conducting business in New York and whose address is 1 Troy Avenue, Brooklyn, NY 11213.

**BACKGROUND**

4.      Decedent  Jean Bryan was the aunt of Plaintiff, Xiomara Nichols (hereinafter referred to

as "Nichols") and with whom she was a Mother Figure to Plaintiff

5.      Decedent was 86 years  of age (DOB October 6, 1935) and lived on her own in Brooklyn,

New York when she fell and hit her head in her home on May 19, 2021.

6.      Decedent was admitted to Beth Israel Hospital to have a CT scan of her head and due to

her elevated blood sugar level possibly due to the fall.

7.      Although there were no fractures shown on the X Ray, Decedent's physician

recommended inpatient rehabilitation so that Decedent could regain her strength.

8.      Decedent was admitted to Upper East Side Rehabilitation Center (hereinafter referred to as

"the Nursing Home) on or about the end of May 2021.

9.      While at the Nursing Home, Decedent had two falls. She also develop an infection in her

gallbladder.

10.     Decedent underwent a procedure to remove a gallbladder stone on June 29, 2021.

11.     Nichols stayed in constant contact with the Nursing Home during her aunt's stay at Upper

East Side.

12.     Nichols was also speaking with a social worker at the Nursing Home named Crystal on

August 31, 2021, to set up home care for decedent and possible discharge back to

decedent's apartment.

13.     On September 4, 2021, Nichols received a call from a nurse named Cheryl that Decedent

passed away.

14.     Prior to her admission, decedent entered into a preplanned funeral contract with Lawrence

H. Woodward Funeral Home (hereinafter referred to as "Woodward")

15.     The preplanned funeral arrangements included a viewing with an open casket and burial

        service and internment in a grave site.

16.     Upon receiving news of her aunt's passing, Nichols called Woodward  so they could

        arrange to pick up Decedent's remains and her to the City Morgue.

17.     When Nichols called, she only was able to speak with the answering service.

18.     No one from Woodward returned Nichols phone call.

19.     Nichols continued to call Woodward  from September 4 through September 8 with no

        return call and no word that her aunt's body was moved from the Nursing Home to the

        City Morgue.

20.     Nichols was informed by the Nursing Home on or about September 8 that when it was

        apparent that no one from Woodward  was going to pick up the body, the Nursing Home

        called the City Morgue.  The City Morgue then transported Decedent's body to its facility.

21.     The Nursing Home had no refrigeration at its facility and thus, Decedent's body was

        stored in an unrefrigerated location for approximately 2-3 days.

22.     On or about September 8, 2021, Nichols again tried to contact Woodward Funeral Home

        via email asking when her aunt's body was to be released.

23.     Nichols did not receive a response to her September 8 email until September 11, 2021,

        when Woodward  advised Nichols that her Aunt had passed away (which she already

        knew) and that Woodward  told the to send the body to the City Morgue.

24.     Nichols had no knowledge of this communication between the funeral home and nursing

        home and no proof of such communication since Woodward did not respond to Nichols

        until September 11, seven (7) days after Decedent's passing.

25.     In the September 11 email, Woodward went on the say that Decedent's body was so decomposed that it was unvieable, thus Nichols was not able to have the proper service for her aunt, i.e. closed casket service and not a viewing.

26.     On September 28, 2021, Nichols tried again to contact Woodward about the funeral service and death certificates with no response.

27.     The funeral service for Bryan was finally held on October 1, 2021 with a closed casket service and then cremation since the body was in such a decomposed state.

28.     Nichols was not able to hold the service and viewing as desired by Decedent and was not able to properly able to control the disposition of Decedent's remains.

29.     Nichols was deprived of their right to find solace and comfort in Decedent's proper burial and was subjected to emotional suffering and anguish when she saw Decedent in her decomposing state.

## COUNT I

## NEW YORK PUBLIC LAW SECTION 4201

30.     Plaintiff hereby incorporates paragraphs 1 through 29 as fully set forth at length herein.

31.     New York Public Health Law 4201(2)(b) states:

> (b)  If a person designated to control the disposition of a decedent's remains, pursuant to this subdivision, is not reasonably available, unwilling or not competent to serve, and such person is not expected to become reasonably available, willing or competent, then those persons of equal priority and, if there be none, those persons of the next succeeding priority shall have the right to control the disposition of the decedent's remains.

32.     New York Public Health Law 4201(2)(c) states:

(c)  The person in control of disposition, pursuant to this section, shall faithfully carry out the directions of the decedent to the extent lawful and practicable, including consideration of the financial capacity of the decedent's estate and other resources made available for disposition of the remains.   The person in control of disposition shall also dispose of the decedent in a manner appropriate to the moral and individual beliefs and wishes of the decedent provided that such beliefs and wishes do not conflict with the directions of the decedent.

33.    Woodward was designated by decedent to oversee and handle the decedent's remains as well as conduct the service for Decedent's family.

34.    Woodward, as the designated funeral home and under 10 NYCRR 77.7(a)(1) to be present and personally supervise and arrange for the removal or transfer of decedent's body from the place where the death occurs.

35.    Woodward failed to properly oversee the handling of decedent's remains .

36.    If Woodward did not have available refrigeration space, then Woodward had an obligation to either call the morgue or another funeral home that had refrigeration space available until Woodward was otherwise able to accommodate Decedent's  remains.

37.    Woodward also had a duty to communicate with Nichols and to let Nichols know the whereabouts of her Aunt and whether or not her Aunt's remains were taken to the City Morgue and the plans on preserving the body until such time as the funeral service could be performed.

38.    The Nursing Home also had an obligation to ensure that Bryan's remains were properly refrigerated and preserved, after it was clear that Woodward was not going to abide by its duty under 10 NYCRR 77.7(a)(1).

39. The Nursing Home failed in this obligation by keeping Bryan's remains in an unrefrigerated storage area for two or more days, thus resulting in Bryan's body to decompose beyond the point where her body could not be viewed and her wishes for a proper burial could not be carried.

40. New York Public Health Law 4201(2)(b) as well as the New York Department of Health guidelines, gives Woodward the authority to contact OCME and to remove decedent's remains.

41. Woodward's  refusal to contact OCME  or another funeral home immediately upon notification of Bryan's passing and its failure to ensure the proper handling and preservation of Bryan's remains is in violation of  New York Public Health Law 4201(2)(b)  and New York Public Health Law 4201(2)(c).

42. The Nursing Home also failed to timely contact OCME for the removal and preservation of Bryan's remains when it was clear that Woodward was not going to arrange for the removal of Bryan's body to OCME or otherwise transport Bryan's body.

43. The violation of 4201(2)(b) and 4201(2)(c) by both Woodward and the Nursing Home interfered with Decedent's final wishes and prevented Nichols to view her Autn's body and conduct a proper funeral.

44. As a further result of both Woodward and the Nursing Home's violation of New York Public Law 4201, Nichols seeks damages for the emotional suffering and mental anguish she suffered in seeing her Aunt's body in such horrific condition.

WHEREFORE, Plaintiff, Xiomara Nichols demand judgment in her favor and against Defendants in an amount in excess of $175,000.00 plus punitive damages, interest, attorneys fees and costs.

## COUNT II

## LOSS OF SEPULCHER – WOODWARD FUNERAL HOME

45.     Plaintiff hereby incorporates paragraphs 1 through 44 as if fully set forth at length herein.

46.     Nichols is the niece of Decedent Jean Bryan and designated contact and power of attorney for the decedent.

47.     Nichols had right to possession of Decedent's remains and exercised that right through Woodward when Woodward was designated as the funeral home for decedent.

48.     Woodward interfered with Plaintiffs' right to possession of Decedent's remains when Woodward failed to contact OCME or another funeral home to place Decedent until Woodward was ready to embalm the body for the viewing, etc.

49.     Woodward further interfered with Plaintiffs' right to possession when Woodward failed to timely communicate with the nursing home about the need to call OCME.

50.     Nichols only became aware that Woodward did not take charge of removing and/or transferring Bryan's remains from the Nursing Home to OCME until days after Bryan's death and when Bryan's body was already in a significant state of decomposition.

51.     Woodward's failure to properly oversee and take charge of the removal and placement of Bryan's remains was not authorized by Nichols.

52.     The sight of Bryan's decomposing body was extremely upsetting to Nichols and continues to greatly emotionally distress Nichols, for which she is seeking damages.

WHEREFORE, Plaintiff Xiomara Nichols demands judgment in her favor and against Defendants in an amount in excess of $175,000.00 plus punitive damages, interest, attorneys fees and costs.

## COUNT III

### LOSS OF SEPULCHER – UPPER EAST SIDE REHABILITATION AND NURSING CENTER

53.    Plaintiffs hereby incorporate paragraphs 1 through 52 as if fully set   forth at length herein.

54.    After a 48 hour period, when the Nursing Home  became aware that Woodward was not removing Decedent from its facility, the responsibility then fell on the Nursing Home to contact OCME to transport Bryan's remains.

55.    The Nursing Home did not timely contact OCME or Nichols and instead, placed decedent's remains in an unrefrigerated area for over two days.

56.    The Nursing Home interfered with Nichols' right to possession of decedent's body by refusing to communicate with Woodward and Plaintiff and refusing to timely contact OCME so that decedent's remains would be preserved until Nichols could carry out Bryan's wishes.

57.    The Nursing Home's refusal to timely OCME after the 48 hour period of decedent's death and instead place the body in a storage facility was not authorized by Nichols.

58.    Nichols became aware of such interference by the Nursing Home when she was finally contacted by the Nursing home at least three days later that Bryan's body was removed to OCME.

59.     The sight of Nichols' Aunt's  decomposing body was extremely upsetting to her and

continues to distress Nichols  greatly emotionally for which she is seeking damages.

WHEREFORE, Plaintiff Xiomora Nichols demands judgment in her favor and against

Defendants in an amount in excess of $175,000.00, plus an award of punitive damages, attorney

fees and costs.

## COUNT IV

## GROSS NEGLIGENCE

60.     Plaintiff hereby incorporates paragraphs 1 through 59 as if fully set forth at length

herein.

61.     Defendants Woodward and the Nursing Home's failure to follow any proper

procedure or protocol in properly handling Decedent's remains, resulting in decedent's

body being locked in an unrefrigerated storage closet for over two days five days was

recklessly indifferent to the rights of Nichols to be able to carry out their mother's wishes

and completely disregarded any dignity to Decedent.

62.     Defendant Woodward's refusal to contact OCME and to arrange for the removal

and transport of Bryan's remains demonstrates that both Woodward completely

disregarded the rights of Nichols to preserve decedent's remains and to be able to conduct

a proper funeral and burial of decedent as per decedent's wishes.

63.     Defendant Nursing Home's refusal to timely contact OCME for the removal of

Bryan's remains after it was apparent that Woodward was not going to arrange for the

removal of Bryan's body completely disregarded the rights of Nichols to Preserve

decedent's remains and to be able to conduct a proper funeral and burial of decedent as per decedent's wishes.

64.     Woodward and the Nursing Home's reckless indifference and failure to exercise even the slightest care to ensure Decedent's body was properly handled, maintained and transported, in accordance with the New York State Public laws and Department of Health directives clearly constitutes gross negligence.

65.     As a result of Woodward and the Nursing Home's  gross negligence, Watkins and Tate suffered and continue to suffer severe emotional distress by seeing their mother in an advanced decomposed state in a storage closet.

        WHEREFORE, Plaintiff Xiomara Nichols demands judgment in her favor and against Defendants in an amount in excess of $175,000.00 plus punitive damages, interest, attorneys fees and costs.

## COUNT V

## NEGLIGENCE

### WOODWARD FUNERAL HOME AND UPPER EAST SIDE REHABILITATION AND NURSING

66.     Plaintiff hereby incorporates paragraphs 1 through 65 as if fully set forth at length herein.

67.     Defendants Woodward and the Nursing Home's failure to follow any proper procedure or protocol in properly handling Decedent's remains, resulting in decedent's body being locked in an unrefrigerated area for over two days was recklessly indifferent to the rights of Nichols to be able to carry out her Aunt's wishes and completely disregarded any dignity to Decedent.

68.     Defendant Woodward's refusal to contact OCME and to arrange for the removal and transport of Bryan's remains demonstrates that both Woodward completely disregarded the rights of Nichols to preserve decedent's remains and to be able to conduct a proper funeral and burial of decedent as per decedent's wishes.

69.     Defendant Nursing Home's refusal to timely contact OCME for the removal of Bryan's remains after it was apparent that Woodward was not going to arrange for the removal of Bryan's body completely disregarded the rights of Nichols to Preserve decedent's remains and to be able to conduct a proper funeral and burial of decedent as per decedent's wishes.

70.     Woodward and the Nursing Home's negligence, carelessness and recklessness to ensure Decedent's body was properly handled, maintained and transported, in accordance with the New York State Public laws and Department of Health directives clearly constitutes negligence.

71.     As a result of Woodward and the Nursing Home's  negligence, Nichols suffers and continues to suffer severe emotional distress by seeing her aunt in an advanced decomposed state.

       WHEREFORE, Plaintiff Xiomara Nichols demands judgment in her favor and against Defendants in an amount in excess of $175,000.00 plus punitive damages, interest, attorneys fees and costs.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

72.     Plaintiffs hereby incorporates paragraphs 1 through 71 as if fully set forth at length herein.

73.     Defendant Woodward and the Nursing Home's failure to follow any proper procedure or protocol in properly handling Decedent's remains, was outrageous and indifferent to the rights of Nichols to be able to carry out her Aunt's wishes and with complete disregard for any dignity to Decedent.

74.     Woodward and the Nursing Home's intentional and reckless indifference and failure to exercise even the slightest care to ensure Decedent's body was properly handled, maintained and transported, in accordance with the instructions of the Decedent and Nichols caused Nichols severe emotional distress and trauma.

75.     As a result of Woodward and the Nursing Home's intentional infliction of emotional distress upon Nichols, Nichols suffered and continues to suffer severe emotional distress by seeing her aunt in an advanced decomposed state.

WHEREFORE, Plaintiff Xiomara Nichols demands judgment in her favor and against Defendants in an amount in excess of $175,000.00 plus punitive damages, interest, attorneys fees and costs.

### COUNT VIII

### BREACH OF CONTRACT AGAINST DEFENDANT WOODWARD FUNERAL HOME

76.     Plaintiff's hereby incorporate paragraphs 1 through 75 as if fully set forth at length herein.

77.     Decedent and Woodward entered into a preneed contract setting forth the terms and conditions of Decedent's funeral arrangements.

78.     Nichols stepped into the shoes of Bryan when she passed, thus establishing a contractual relationship with Woodward.

79.     When Woodward failed to respond to Nichols and failed to exercise its role as the

funeral director in overseeing and arranging for the transport of Bryan's remains,

Woodward breached its contract with Bryan/Nichols.

80.     As a result of the breach of contract, Nichols  paid for services not provided for

by Woodward.


WHEREFORE, Plaintiff Xiomara Nichols hereby demands judgment in her favor and
against Defendants in an amount in excess of $175,000.00 plus interest, attorney fees and costs.


Respectfully submitted,

*Robin J. Gray*

_____
Robin J. Gray, Esq.
PO Box 6874
Wyomissing, PA 19610
Phone:  (484) 769-5855
Fax:     (6100 777-1432
Email:  robin@robinjgraylaw.com
NY ID 4434940


Date:  07/22/2022
        Wyomissing, PA